Filed 10/28/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| RINCON BAND OF LUISEÑO MISSION INDIANS OF THE RINCON RESERVATION CALIFORNIA et al., | D077571 |
| Plaintiffs and Appellants, | (Super. Ct. No. 37-2018-00058170-CU-NP-CTL) |
| v. | |
| LARRY FLYNT et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy Taylor, Judge.  Affirmed.

Fennemore Craig, Todd Kartchner; Crowell Law Office Tribal Advocacy Group and Scott Crowell for Plaintiffs and Appellants.

Denise Turner Walsh, Attorney General (Rincon Band of Luiseño Mission Indians of the Rincon Reservation California), for Plaintiff and Appellant Rincon Band of Luiseño Indians.

Richard Wideman; and Walter Viar for Plaintiff and Appellant Santa Ynez Band of Chumash Indians.

Dentons US, Jeffry Butler; and Paula Yost, Attorney General (Yocha Dehe Wintun Nation), for Yocha Dehe Wintun Nation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Tuari Bigknife, Attorney General (Viejas Band of Kumeyaay Indians), for Viejas Band of Kumeyaay Indians as Amicus Curiae on behalf of Plaintiffs and Appellants.

Mark Radoff for Sycuan Band of the Kumeyaay Nation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Steve M. Bodmer for Pechanga Band of Luiseño Indians as Amicus Curiae on behalf of Plaintiffs and Appellants.

Diane Vitols for Morongo Band of Mission Indians as Amicus Curiae on behalf of Plaintiffs and Appellants.

John T. Plata for Agua Caliente Band of Cahuilla Indians as Amicus Curiae on behalf of Plaintiffs and Appellants.

Michael Hollowell for Redding Rancheria as Amicus Curiae on behalf of Plaintiffs and Appellants.

 Procopio Cory Hargreaves & Savitch and Glenn M. Feldman for Cabazon Band of Mission Indians and San Pasqual Band of Mission Indians as Amici Curiae on behalf of Plaintiffs and Appellants.

Susan Jensen for California Nations Indian Gaming Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Karcher Harmes and Kathryn E. Karcher for Defendants and Respondents Blackstone Gaming, LLC, PT Gaming, LLC, Pacific United Service, Inc., Metis TPS, LLC, Knighted Ventures, LLC, and Majesty Partners, LLC.

2

Solomon Ward Seidenwurm & Smith and Stephen L. Schreiner, for Defendants and Respondents Blackstone Gaming, LLC, PT Gaming, LLC, Pacific United Service, Inc., and Sahara Dunes Casino.

Law Office of Tracey Buck-Walsh and Tracey Buck-Walsh for Defendant and Respondent PT Gaming, LLC.

Koning Zollar, Blake M. Zollar, Shaun Paisley; Falk & Sharp and Keith A. Sharp for Defendant and Respondent Metis TPS, LLC.

Hogan Lovells and Ann C. Kim for Defendants and Respondents Knighted Ventures, LLC and Majesty Partners, LLC.

J. Blonien and Danielle M. Guard for Defendants and Respondents Halcyon Gaming, LLC, LE Gaming, Inc., Certified Players, Inc., and Qualified Players Services.

Law Office of Martin N. Buchanan and Martin N. Buchanan for Defendants and Respondents California Commerce Club, Bicycle Casino, LP, Sahara Dunes Casino, LP, Hollywood Park Casino Company, Oceans 11 Casino, LLC, Celebrity Casinos, Inc., Stones South Bay Corp., Hawaiian Gardens Casino, El Dorado Enterprises, Inc., and Casino, LLC.

Cooley, Michael A. Attanasio and Leo P. Norton for Defendant and Respondent Hawaiian Gardens Casino.

Gibson, Dunn & Crutcher and Maurice Min-Ho Suh for Defendants and Respondents Bicycle Casino, LP, Hollywood Park Casino Company, LLC, and Celebrity Casinos, Inc.

Duane Morris and Patricia P. Hollenbeck for Defendant and Respondent Stones South Bay Corp.

White & Reed and Michael R. White for Defendant and Respondent Oceans 11 Casino.

Lipsitz Green Scime Cambria, Jonathan W. Brown; Law Offices of Mark Hoffman, Erika Mansky and Mark Hoffman for Defendants and Respondents Larry Flynt, individually and as trustee of the Larry Flynt Revocable Trust, Casino, LLC, and El Dorado Enterprises, Inc.

Greenfield Southwick and Maureen Harrington for Defendant and Respondent California Commerce Club.

INTRODUCTION

The California Constitution gives American Indian tribes the exclusive right to offer casino-style banked games[1] in California. (Cal. Const., art. IV, § 19, subd. (f).) The plaintiffs—two American Indian tribes, business entities affiliated with the tribes, and individual tribe members—sued a number of non-tribal cardrooms alleging they were offering banked card games on non-tribal land, in violation of the exclusive right of Indian tribes to offer such games. Based on those allegations, the plaintiffs asserted claims for public nuisance, unfair competition, declaratory and injunctive relief, and tortious interference with a contractual relationship and prospective economic advantage.

The defendants demurred and, after two rounds of amendments to the complaint, the trial court sustained the third and final demurrer without

---

[1] Banked games, including, most notably, twenty-one or blackjack, are "those games in which there is a person or entity that participates in the action as 'the one against the many' [citation], 'taking on all comers, paying all winners, and collecting from all losers' [citation], doing so through a fund generally called the bank [citation]." (*Hotel Employees and Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 592 (*Hotel Employees*).) In short, banked games are those in which the casino or the " 'house' " has a monetary stake in the game. (*Artichoke Joe's v. Norton* (E.D.Cal., 2002) 216 F.Supp.2d 1084, 1092, fn. 3.)

leave to amend and entered judgment of dismissal. The court ruled that, as governmental entities, the Indian tribes and their affiliated business entities are not "persons" with standing to sue under the unfair competition law (UCL) (Bus. & Prof. Code, §§ 17201, 17204), and are not "private person[s]" with standing under the public nuisance statutes (Civ. Code, §§ 3480, 3493.) The court further ruled the business entities and the individual tribe members failed to plead sufficient injury to themselves to establish standing to sue under the UCL or the public nuisance statutes.

Although the plaintiffs broadly frame the issue on appeal as whether they, as American Indians, have standing to redress their grievances in California state courts, it is actually much narrower. The issue we must decide is whether the complaint in this case adequately pleads the asserted claims and contains allegations sufficient to establish the threshold issue of whether any of the named plaintiffs have standing to bring those claims. We agree with the trial court's conclusion that the complaint does not do so and, therefore, affirm the judgment in favor of the defendants.[2]

---

[2] We have read and considered the amicus curiae brief submitted by the Yocha Dehe Wintun Nation, the Viejas Band of Kumeyaay Indians, the Sycuan Band of the Kumeyaay Nation, the Agua Caliente Band of Cahuilla Indians, the Redding Rancheria, the Cabazon Band of Mission Indians, the San Pasqual Band of Mission Indians, the Morongo Band of Mission Indians, the Pechanga Band of Luiseño Indians, and the California Nations Indian Gaming Association (collectively, the Amici Tribes) and the answer to the amicus curiae brief by the defendants and respondents.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Parties*

A.    *Plaintiffs*

As alleged in the operative second amended complaint (SAC), there are three separate groups of plaintiffs in this lawsuit:  1) two American Indian tribes within the state of California—the Rincon Band of Luiseño Mission Indians of the Rincon Reservation (the Rincon Band) and the Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation (the Chumash Band) (together, the Tribes); 2) 10 business entities affiliated with the Tribes (the Tribe Entities); and 3) 12 individual members of the Rincon Band (the Tribe Members) (collectively, Plaintiffs).

1.    *The Tribes*

The Rincon Band and the Chumash Band are each "a federally recognized Indian tribe."  The Rincon Band has its reservation located in San Diego County and the Chumash Band has its reservation in Santa Barbara County.

2.    *The Tribe Entities*

The Tribe Entities are business entities "affiliat[ed] with or . . . operated by members of" the Tribes.  There are three business entities affiliated with the Rincon Band:  Rincon Economic Development Corporation, a federally chartered corporation doing business on the Rincon Band reservation; First Nations Economic Development Corporation, a federally chartered corporation doing business in southern and central California and on the Rincon Band reservation; and Harrah's Resort Southern California, "an unincorporated entity of the Rincon Band" doing business on the Rincon Band reservation.

6

There are 10 business entities affiliated with the Chumash Band: Chumash Casino and Resort Enterprise, "an unincorporated entity of the Chumash Band" doing business on the Chumash Band reservation; five California limited liability companies doing business in Santa Barbara County, including SYBCI California Hotel No. 2, LLC, Chumash California Hotel No. 1, LLC, Chumash California Gas Station No. 1, LLC, Chumash California Gas Station No. 3, LLC, and Chumash Cellars, LLC; and Chumash Vineyards, LLC, a "tribally chartered limited liability company" doing business in Santa Barbara County.

Plaintiffs allege that "[a]side from their affiliation with or being operated by members of federally recognized Indian tribes," the Tribe Entities "operate in the same manner as other corporations, limited liability companies, and unincorporated entities."

### 3. *The Tribe Members*

The Tribe Members include the chairperson and a member of the Tribal Council who reside on the Rincon Band reservation and 10 other individual members of the Rincon Band, who each reside in non-tribal communities throughout "the greater Los Angeles/San Diego metropolitan area."

## B. *Defendants*

Plaintiffs brought this lawsuit against two categories of defendants: (1) 11 owners and operators of commercial cardrooms in various parts of southern California (the Cardroom Defendants) and (2) 13 third-party proposition players (the TPP Defendants) (collectively, Defendants).

The Cardroom Defendants operate gaming establishments on non-tribal land, which can legally offer non-banked card games, such as poker, for play by the public for a per-hand fee. The Cardroom Defendants have historically offered legal non-banked card games in which "there is no bank or house against which players bet. The deal would continuously rotate

7

among the players, with the cardroom having no interest in the results of any hand or the winnings of any player-dealer or other participant." The Cardroom Defendants include: Larry Flynt, as an individual and as trustee of the Larry Flynt Revocable Trust; El Dorado Enterprises, Inc., doing business as Hustler Casino; California Commerce Club, Inc., doing business as Commerce Casino; The Bicycle Casino, L.P.; Hawaiian Gardens Casino; Hollywood Park Casino Company, Inc.; Oceans 11 Casino, Inc.; Player's Poker Club, Inc.;[3] Stones South Bay Corp., which owns Seven Mile Casino; Celebrity Casinos, Inc., which owns Crystal Casino; and Sahara Dunes Casino, L.P, doing business as Elsinore Hotel and Casino.

The TPP Defendants are companies that hire " 'proposition player[s],' . . . individual[s] paid by the cardroom to sit at the tables and reinvigorate games with dwindling action and thereby stimulate additional revenue for the cardroom in the form of per-hand fees collected from every player, as well as increased food and beverage sales. While the [proposition players] were paid to sit at the tables, they were required to gamble with their own money[.]"[4] The TPP Defendants are: Blackstone Gaming, LLC; Halycon Gaming, LLC; PT Gaming, LLC; Global Player Services, Inc.; Dragon Player

---

[3] Player's Poker Club, Inc. is in bankruptcy. In accordance with this court's orders of April 27, 2021 and October 20, 2021, the appeal as to Player's Poker Club, Inc. under section 362 of the Bankruptcy Code (11 U.S.C. § 362) has been stayed and severed from this appeal.

[4] The hiring of such individuals to facilitate the play of non-banked card games is subject to agreements approved by the United States Department of Justice. (See Bus. & Prof. Code, § 19984 ["a licensed gambling enterprise may contract with a third party for the purpose of providing proposition player services at a gambling establishment" subject to certain conditions, including the advanced approval of the contract].)

Services, LLC; Knighted Ventures, LLC; Majesty Partners, LLC; Certified Players Inc.; Pacific United Service Inc.; L.E. Gaming, Inc.; Qualified Player Services, LLC; Acme Player Services, LLC; and Metis TPS, LLC.

## II.

### *History of California Gaming Law*

Central to Plaintiffs' claims in the SAC and appeal is the assertion that American Indian tribes have the exclusive right to offer casino-style banked card games in California. We therefore begin with a brief history of the relevant California gaming law before turning to the underlying litigation.

Gambling has been regulated in California since the enactment of the state Constitution in 1849. Article IV, section 27 of the original Constitution prohibited lotteries and the sale of all lottery tickets. (See *United Auburn Indian Community of Auburn Rancheria v. Newsom* (2020) 10 Cal.5th 538, 549 (*United Auburn*).) "[W]hen the Penal Code was enacted in 1872, it prohibited several activities that fall within the ambit of gambling, including slot machines, roulette, and [some game called] hokey-pokey." (*Ibid.*) "Over time, however, [the Constitution] has been amended several times to loosen those prohibitions" but not to allow casino-style gaming. (*Ibid.*) Since 1872, banked card games, such as twenty-one or blackjack, in which a banker " 'pays off all winning wagers and keeps all losing wagers' " have been prohibited. (*Hotel Employees*, *supra*, 21 Cal.4th at pp. 592–593; Pen. Code, § 330.)

"In 1984, the people of California amended our Constitution to state a fundamental public policy against the legalization in California of casino gambling." (*Hotel Employees, supra,* 21 Cal.4th at p. 589.) Article IV, section 19(e) was added to the Constitution by voter initiative to declare that "[t]he Legislature has no power to authorize, and shall prohibit, casinos of the type

9

currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e), added by initiative, Gen. Elec. (Nov. 6, 1984) (hereafter article IV, section 19(e)); *Hotel Employees,* at p. 589.)  This "anticasino provision" has been interpreted to refer to establishments that offer banked table games and gaming devices such as slot machines. (*Hotel Employees*, at pp. 604, 605.)

In 1987, the United States Supreme Court decided *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 (*Cabazon*), a case arising from California's attempt to enforce its state criminal law permitting the play of bingo only when operated by certain charitable organizations with restrictions on prizes, against federally recognized Indian tribes offering the game on tribal land. (*Id.* at p. 205.)  California asserted that Congress expressly granted to it "broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State" under Public Law 280.[5]  (*Id.* at p. 207.)  Ruling in the tribes' favor, the Court concluded that California lacked the power to restrict tribal gaming.  "[T]he *Cabazon* court held, [under Public Law 280,] the laws of these states generally applied to activities in Indian country to the extent the law was 'prohibitory,' but did not generally apply to the extent it was 'regulatory,' the shorthand test being whether the conduct at issue violates the state's public policy." (*Hotel Employees*, *supra*, 21 Cal.4th at p. 595, citing *Cabazon*, at pp. 207–210.)  Because California regulated but did not prohibit gambling, state laws governing the operation of gambling in general, and bingo in particular, were not enforceable on tribal land. (*Ibid.*)  Following *Cabazon*,

___

5    Enacted by Congress in 1953, Public Law 280 "empowered six states — including California — to exercise criminal jurisdiction over Indian land. (18 U.S.C. § 1162; 25 U.S.C. §§ 1321–1326; 28 U.S.C. § 1360.)." (*United Auburn*, *supra,* 10 Cal.5th at p. 545.)

California could not restrict or regulate Indian gaming operations on tribal land unless it prohibited all gambling in the state. (See *United Auburn, supra*, 10 Cal.5th at p. 549.)

"In 1988, in the wake of *Cabazon*, Congress enacted [the Indian Gaming Regulatory Act or] IGRA (Pub.L. No. 100–497 (Oct. 17, 1988), 102 Stat. 2467, as amended, codified at 25 U.S.C. § 2701 et seq. and 18 U.S.C. § 1166 et seq.), with the declared purpose to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments' (25 U.S.C. § 2702(1)), while at the same time providing a basis for regulation of Indian gaming so as to shield it from organized crime and corruption, prevent exploitation for non-Indian profit, and ensure fair and honest gaming. (IGRA, § 3; 25 U.S.C. § 2702(1), (2).)" (*Hotel Employees, supra*, 21 Cal.4th at p. 595.)

IGRA divides gaming into three different categories: Class I games are "social games [played] solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." (25 U.S.C. § 2703(6).) Class II games are bingo and card games explicitly authorized by state law but excluding "any banking card games, including baccarat, chemin de fer, or blackjack (21)" and "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." (*Id.*, § 2703(7)(A) and (B).) Class III games include "all forms of gaming that are not class I gaming or class II gaming." (25 U.S.C. § 2703(8).) "IGRA provides for the regulation of each of the three categories of gaming[—]from the lightest regulation for class I, by tribal action alone without federal or state participation; to heavier regulation for class II, by joint federal and tribal participation; to the heaviest

11

regulation for class III, by state and tribal participation through tribal-state compacts plus federal oversight.  (25 U.S.C. § 2710.)"  (*Hotel Employees*, *supra*, 21 Cal.4th at p. 596.)

"Class III gaming, comprising all gaming outside class I and class II, including pari-mutuel horse race wagering, lotteries, banked table games and gaming devices, is, unquestionably, the 'most lucrative kind.' "  (*Hotel Employees*, *supra*, 21 Cal.4th at p. 596.)  "Because class III gaming can be 'a source of substantial revenue for the Indian tribes and a significant rival for traditional private sector gaming facilities,' its regulation 'has been the most controversial part of . . . IGRA and the subject of considerable litigation between various Indian tribes and the states.' "  (*United Auburn, supra*, 10 Cal.5th at p. 546.)

To resolve the disputes that arose between the State of California and Indian tribes over class III gaming on Indian land, Proposition 5, "The Tribal Government Gaming and Economic Self–Sufficiency Act of 1998," was put on the ballot to authorize various forms of gaming on tribal lands.  (*Hotel Employees, supra,* 21 Cal.4th at pp. 589, 596–597.)  California voters passed the measure in 1998.  Thereafter, a number of tribes requested tribal-state gaming compacts to allow them to offer gaming, pursuant to IGRA and Proposition 5.  (*Id*. at p. 590.)  While those requests were pending, the California Supreme Court in *Hotel Employees* concluded that Proposition 5 was "invalid because it [wa]s inconsistent with the anticasino provision of article IV, section 19, subdivision (e) of the California Constitution," and

12

issued a writ prohibiting the Governor from implementing the new law.[6] (*Id.* at pp. 615–616.)

Two years later, in March 2000, California voters ended the prohibition against casino-style gaming on tribal land with the enactment of Proposition 1A. (*United Auburn, supra,* 10 Cal.5th at p. 549; Cal. Const., art. IV, § 19(f).) Proposition 1A amended the Constitution to give the Governor the authority " 'to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law.' " (*United Auburn*, at pp. 549–550, quoting Cal. Const., art. IV, § 19(f).) "Notwithstanding the Constitution's general restriction on casino-style gaming, Proposition 1A allowed that type of gaming 'to be conducted and operated on tribal lands subject to [tribal-state] compacts.' " (*United Auburn*, at p. 550.)

In September 2000, the Legislature amended the Penal Code and the Gambling Control Act (Bus. & Prof. Code, § 19800 et seq.), which prohibits the operation of gambling enterprises off tribal land except as expressly authorized by statute, to "authorize gambling establishments to operate controlled games utilizing a player-dealer position." (Stats. 2000, ch. 1023 (Assem. Bill No.1416), ¶ 1.) Penal Code section 330.11 and Business and Professions Code section 19805, subdivision (c) now provide that a " 'banked

---

[6] The Court determined that the provision of Proposition 5 containing the State of California's waiver of immunity from suit in disputes arising out of negotiations for tribal-state compacts was not invalid and survived because it was separable from the invalid parts. (*Hotel Employees, supra*, 21 Cal.4th at pp. 612–615.)

13

game' does not include a controlled game if the published rules of the game feature a player-dealer position and provide that this position must be continuously and systematically rotated amongst each of the participants during the play of the game, ensure that the player-dealer is able to win or lose only a fixed and limited wager during the play of the game, and preclude the house, another entity, a player, or an observer from maintaining or operating as a bank during the course of the game." (Pen. Code, § 330.11; Bus. & Prof. Code, § 19805, subd. (c).) As amended, Penal Code section 330.11 creates an exception to the prohibition on "banked games" on non-tribal land and permits such games so long as the rules of the game provide a player-dealer position that is continuously and systematically rotated among each of the participants throughout the game. Essentially, the player-dealer is in the position of the "bank" but because the position rotates throughout the game, each player occupying the role of the player-dealer is able to win or lose only a fixed amount during the play of the game. Thus, there is no "house" or similar entity capable of operating as a bank.

### III.

### *The Pleadings and Demurrers*

A.  *Original Complaint and Demurrer*

The Rincon Band and the Chumash Band were the only two plaintiffs named in the original complaint filed in 2018. The only named defendants were the Cardroom Defendants. Several unnamed third-party proposition players (TPPs) were included as Doe defendants. The complaint alleged two causes of action against the Cardroom Defendants—a public nuisance claim (Civ. Code, § 3480 et seq.; count 1) and an unfair competition claim (Bus. & Prof. Code, § 17200 et seq.; count 2)—and two causes of action for civil conspiracy to commit a public nuisance and unfair competition against the unnamed TPPs (counts 3 and 4).

14

The complaint alleged the Tribes are "federally-recognized Indian tribe[s]" with the exclusive right to offer class III banked card games on tribal land in California pursuant to article IV, section 19(f) of the California Constitution and were "entitled by their inherent sovereign authority . . . to have such gaming opportunity manifest tribal economic development, self-sufficiency, and strong tribal government." It alleged the Cardroom Defendants were restricted to offering non-banked games. The complaint further alleged the Cardroom Defendants traditionally offered non-banked games on non-tribal land pursuant to California law and, at times, employed TPPs to help stimulate additional game play, and thus additional per-hand fees.

The complaint alleged, however, that class III banked card games such as blackjack and baccarat gained popularity on tribal land and the Cardroom Defendants wanted to compete "to make more money" by offering those same games in their cardrooms. To do so, the Cardroom Defendants exploited the amendments to Penal Code section 330.11 and Business and Professions Code section 19805, subdivision (c), which authorized the use of a player-dealer position, to restructure certain player-dealer position games to effectively, and illegally, offer class III banked games on non-tribal land.

Specifically, the complaint alleged the Cardroom Defendants "fail[ed] to rotate the 'banker' position at their tables," "routinely waive[d] per-hand collection fees for all but the [TPPs]," "allow[ed] the TPPs to function as the bank of a banked card game," and "contract[ed] with TPPs . . . in a manner that provides [the Cardroom Defendants] an interest . . . in funds wagered, lost, or won." In other words, the Cardroom Defendants had the TPPs "act as player-dealers to effectively 'bank' the game in violation of the California Constitution, Penal Code [s]ection 330 and Proposition 1A." This, the Tribes

15

alleged, deprived them of their exclusive right to offer banked games on tribal land.

The complaint further alleged, as an "important" and "ironic" point, that the Tribes are restricted to offering gaming on their reservations "which are in most cases remote and therefore not near the urban centers from which they draw their customers." The Cardroom Defendants, "by contrast, are not limited geographically. Thus, they violate the [T]ribes' exclusivity established in Proposition 1A and IGRA by offering their illegal games in dense population centers, and get to do so much closer to where . . . [the] Tribes' gaming customers live."

The Tribes alleged the Rincon Band lost at least $13.8 million per year and the Chumash Band lost at least $4.42 million per year in "governmental revenue," from 2013 to 2017, as a result of gaming being diverted from tribal casinos to illegal non-tribal cardroom operations. The complaint further alleged that "[p]ursuant to tribal and federal law, governmental revenue generated from tribal gaming revenue cannot be used for purposes other than (i) to fund tribal government operations or programs, (ii) to provide for the general welfare of the Indian tribe and its members, (iii) to promote tribal economic development, (iv) to donate to charitable organizations, or (v) to help fund operations of local government agencies. 25 USC § 2710(b)(2)(B). Accordingly, every dollar of lost revenue is a dollar lost in those governmental programs and services." In addition to the loss of governmental revenue, the Tribes alleged they "experienced losses of business, . . . tribal employment opportunity, competitive advantage, market share, and goodwill in the marketplace[.]" The Tribes sought both monetary and injunctive relief.

16

The Cardroom Defendants demurred to the complaint and asserted the Tribes did not have standing to bring their claims. The trial court agreed and sustained the demurrer with leave to amend.

The trial court found the Tribes failed to allege standing to bring a public nuisance claim because they were not a public representative authorized to bring a claim on behalf of the people of the State of California pursuant to Code of Civil Procedure section 731, and, as sovereign governmental entities, they were not a " 'private person' " with standing to sue on their own behalf within the meaning of Civil Code section 3493. The court also found the Tribes failed to allege a "sufficient public harm," or that they suffered from the same harm as the public, particularly because the complaint alleged the Tribes are " 'remote' " and " 'not near the urban centers from which they draw their customers' . . . suggesting [the Tribes] do <u>not</u> suffer from the same harm as communities or neighborhoods that surround or are near defendants' cardrooms." Similarly, the court found the Tribes failed to allege standing to bring a UCL claim because they are not among those representatives authorized to bring claims on behalf of the public pursuant to Business and Professions Code section 17204, and, as sovereign governmental entities, they were not a " 'person' " within the meaning of Business and Professions Code section 17201.

B.    *First Amended Complaint and Demurrer*

Plaintiffs filed a first amended complaint (FAC). The FAC maintained the Tribes are federally recognized Indian tribes but added that they are also each "a separate organized community of persons of Indian descent." The FAC named 23 new plaintiffs, including the 10 Tribe Entities and 13 Tribe Members, and 13 new TPP defendants in place of the Doe defendants.

The FAC replaced all references of "governmental revenue" lost by the Tribes as a result of the allegedly illegal cardroom operations with lost "tribal

17

revenue." It also deleted the allegation that the Tribes' reservations were "remote, and therefore not near" the urban centers from which they drew their customers.

The FAC added new allegations regarding the "significant public harm" created by the Cardroom Defendants' allegedly illegal banked gaming. Specifically, it alleged that "[u]nregulated casino gaming off of Indian lands inflicts corrupt business practices" on gaming patrons, those doing business with the cardrooms, local governments that rely on "an illicit source of revenue," and the general public. It further alleged that "[t]he complexity of the manner" in which the Cardroom Defendants offered banked games "materially hinders effective regulation adequate to shield them from organized crime and other corrupting influences," and resulted in "material money laundering," "pathological gambl[ing]," and "substantial hardship on their [i.e. Defendants'] communities and significantly increase[d] these communities' economic costs, particularly with regard to public assistance programs, court systems and prison systems."

Finally, the FAC added four additional causes of action. Count 5 sought injunctive relief against all defendants for an alleged violation of article IV, section 19(e). Count 6 sought declaratory relief against all defendants for the same constitutional violation and for violation of Penal Code section 330.11. Counts 7 and 8, asserted solely by the Chumash Band, alleged tortious interference with contractual relations and tortious interference with prospective economic advantage, based on the alleged economic relationship formed by the gaming compact between the State of California and the Chumash Band.

Defendants demurred to the FAC and the trial court again sustained the demurrer with leave to amend. The court found the Tribes failed to cure

18

their lack of standing, and the newly added Tribe Entities and Tribe Members did not adequately plead their own standing.

As to the public nuisance claim, the court found: (1) The FAC failed to sufficiently plead standing for the Tribes and Tribe Entities, since they are not among the designated representatives to bring a public enforcement action and, as governmental entities, they are not a "person" with standing to sue on their own behalf. The allegation that the Tribe Entities "lost 'tribal revenue,' suggest[ed] [they] are <u>not</u> a private person." (2) The FAC failed to allege that all plaintiffs suffered from the same harm as the public. It "concedes the gaming undertaken by the . . . [T]ribes is 'limited geographically' to 'Indian lands,' whereas the [C]ardroom [D]efendants are located 'much closer to the residence of many of their customers.' " The court further found the Tribes "cannot share the public harm since the reservations are 'remote' and 'not near' the locations of defendants' cardrooms" and, as alleged, the Tribe Members reside in locations "from San Diego to Santa Barbara, with many . . . residing hundreds of miles from many of the cardrooms." (3) The FAC failed to allege sufficient public harm. (4) The FAC failed to allege the Tribe Entities and Tribe Members suffered any special harm. It "does not plead direct financial losses suffered" by these plaintiffs, rather it alleges the Cardroom Defendants' actions "resulted in the loss of 'tribal' revenue."

As to the UCL claim, the court found: (1) The Tribes and Tribe Entities lack standing for the same reasons that defeat their public nuisance claim. The court determined the new allegation that the Tribes are also each "a separate organized community of persons of Indian descent" does not confer standing. (2) The FAC failed to allege the Tribe Entities and Tribe Members " 'lost money or property as a result of unfair competition,' " since these

19

plaintiffs did not allege direct financial losses and there was no alleged connection between the Tribes' purported economic injury and these plaintiffs.

As to the claims for injunctive and declaratory relief, the trial court concluded article IV, section 19(e) is not self-executing or directly judicially enforceable and, therefore, Plaintiffs necessarily sought enforcement of article IV, section 19(e) through the UCL claim, which failed for lack of standing. The court also concluded that Plaintiffs failed to demonstrate a declaratory relief action may be used by private parties in a civil action to enforce criminal statutes, including Penal Code section 330.11. Finally, the trial court found the tortious interference claims asserted by the Chumash Band failed because the FAC did not adequately allege a breach or actual disruption of the gaming compact between the Chumash Band and the State of California.

C. *Second Amended Complaint and Demurrer*

Plaintiffs then filed the SAC at issue in this appeal, which asserts the same causes of action against the same defendants. The SAC deleted the allegations that the Tribes had "inherent sovereign authority" and were entitled to "tribal" economic development and "strong tribal government." It also replaced all references to lost "tribal revenue"—previously "governmental revenue" in the FAC—with lost "[g]aming [r]evenue," and deleted the allegation that "every dollar of lost gaming revenue is a dollar lost . . . in . . . tribal programs and services."

The SAC added that Penal Code section 11225, subdivision (a)(1) "declares illegal gaming of the type the [Cardroom Defendants] offer to be a nuisance, such that it is presumed to be harmful to Californians as a whole," and alleges it to be a nuisance per se. It now requests a judicial declaration

20

that "Defendants are operating illegal gaming within the scope of Penal Code § 11225(a)(1)" as part of the declaratory relief claim.

As to specific harms to Plaintiffs, the SAC alleges that "Plaintiffs," *generally*, "underperformed" and experienced "little growth" as compared to other jurisdictions offering similar gaming operations, because the Cardroom Defendants' illegal gaming "divert[ed] revenue from lawful gaming of the type only [the Tribe] Entities and those similarly situated may offer." Having changed all references of "tribal revenue" to "[g]aming [r]evenue," the SAC further alleges that all gaming revenue must be used for funding government operations, providing for the general welfare of the tribe and its members, promoting economic development, making charitable donations, or funding local government agencies, pursuant to the Revenue Allocation Plan. Accordingly, the SAC asserts, "each dollar of [g]aming [r]evenue is allocated to Plaintiffs and for Plaintiffs' benefit." This last allegation replaced the FAC's assertion that "every dollar of lost gaming revenue is a dollar lost . . . in . . . tribal programs and services."

The SAC removed one of the Tribe Members as a plaintiff and added allegations that all but two, who reside on the Rincon Band reservation, reside in communities "in close proximity" to one or more of the Cardroom Defendants throughout the "the greater Los Angeles/San Diego metropolitan area." With respect to specific harm to the Tribe Members, the SAC alleges that distributions of gaming revenue "are made directly" to them and "directly to tribal programs and benefits, including health care, on which [they] rely." As for the Tribe Entities, the SAC alleges that gaming revenue "is allocated to and retained by the [Tribe] Entities to fund operations and infuse capital into their business, which is then used for capital improvements, to lawfully create competitive advantages, and establish

21

financial reserves to fund operations during periods of recession or loss." Finally, the SAC alleges, "[b]ecause they fall within the only class of individuals entitled to enjoy revenue from banked card games in California, all Plaintiffs suffer direct and indirect losses" as a result of Defendants' illegal gaming activity.

Defendants filed a third demurrer and asserted the amendments were insufficient to cure the previous defects in the complaint. The trial court agreed and sustained the demurrer on the same grounds as before, this time without leave to amend.

As to the public nuisance claim, the trial court found the SAC's new allegation that the Tribe Members reside in " 'close proximity' " to one or more of the Cardroom Defendants did not help establish that they suffer the same harm as the public. Rather, the SAC fails to explain how the Tribe Members and Cardroom Defendants, "which are in different neighborhoods, cities, and counties in Southern California . . . are in fact in 'close proximity' to one another." The court also found the SAC's attempt to allege the Tribe Entities and Tribe Members suffer a special harm insufficient. It acknowledged that the SAC "delete[d] references to tribal revenues, programs, and services that were pled in the FAC . . . , and pleads the new allegation that the [Tribe Entities] and the [Tribe Members] have been deprived of '[g]aming [r]evenue' that 'are made directly' to them under the [T]ribes' 'Revenue Allocation Plans,' " but concluded it was "devoid of factual allegations regarding the alleged distributions to either the [Tribe Entities or Tribe Members] under the 'Revenue Allocation Plans.' "

As to the UCL claim, the trial court found the SAC failed to allege that the Tribe Entities and Tribe Members " 'lost money or property as a result of unfair competition.' " Again, the court addressed the new allegations

22

regarding the distribution of gaming revenue through the Revenue Allocation Plans, but stated, the UCL claim "fails to allege facts that the [Tribe Members] actually receive a distribution from a revenue allocation plan" and "fails to provide authority that the distribution to tribal programs and services is 'money or property' under the UCL."[7]

The trial court noted Plaintiffs did not expressly seek leave to amend and, although they had multiple opportunities to amend, the changes in the SAC "did not cure the essential defects identified in the previous round of demurrers." Thus, it sustained the demurrer without leave to amend and entered a judgment of dismissal on May 28, 2020. Plaintiffs timely appealed.

DISCUSSION

I.

*Standard of Review*

Our review of the judgment of dismissal and the order sustaining Defendants' demurrer to the SAC is de novo. We independently examine the operative complaint "to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162; *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166.)

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions

---

[7] As noted, the SAC does in fact allege that distributions of gaming revenue "are made directly" to the Tribe Members and "directly to tribal programs and benefits, including health care, on which [they] rely." Still, as we will explain *post*, the SAC does not adequately allege the Tribe Members would have received *additional* distributions absent the alleged unfair competition from the Cardroom Defendants.

23

or conclusions of fact or law.  [Citation.]  We also consider matters which may be judicially noticed.'  [Citation.]  Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)  We may also consider prior versions of the pleading, particularly where previous allegations are altered or omitted without adequate explanation.  (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 12 (*Shoemaker*) [appellate court properly considered allegations in first complaint when testing the sufficiency of the third]; *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1109 (*Pierce*) [considering changes to an unverified pleading in response to a demurrer].)

As relevant here, "[s]tanding is a threshold issue necessary to maintain a cause of action, and the burden to allege and establish standing lies with the plaintiff."  (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 809 (*Mendoza*).)  Finally, as with any appeal, the appellants have the burden of demonstrating error.  (*Aguilera v. Heiman* (2009) 174 Cal.App.4th 590, 595.)

## II.

### *Issues on Appeal*

Before turning to our analysis of the SAC under the applicable standard of review, we find it important to clarify what is, and is not, at issue in this appeal.

Plaintiffs assert the trial court erroneously concluded that they "do not have standing to redress grievances in California state courts because they are Indians, and therefore are not 'persons' " under the relevant statutes. They further assert the court reached that conclusion based on a "misapprehension of the status of Tribes, how they exists [*sic*], and who they are."  Amici Tribes go so far as to claim the court's ruling "[b]arring Indian

24

tribes from court on all cases involving UCL claims without authority to do so is draconian at best and discriminatory at worst." (Italics omitted.) The record reveals these are neither fair nor accurate characterizations of the trial court's decision and reasoning.

To the contrary, the trial court separately considered each category of plaintiffs and concluded *the Tribes*, and the *Tribe Entities* insofar as they were acting on behalf of the Tribes—as *sovereign governmental entities*—are not "persons" with standing to sue under the UCL (Bus. & Prof. Code, §§ 17201, 17204), and are not "private persons" with standing to sue under the public nuisance statutes (Civ. Code, §§ 3480, 3493; Code Civ. Proc., § 731). Thereafter, the court separately found that the Tribe Entities and Tribe Members failed to allege sufficient injury to establish their own standing to sue under the two statutes. The court did not conclude, as Plaintiffs have framed the ruling, that any individual Tribe Member is not a "person" under the relevant statutes. As we shall explain, the trial court's ruling on the demurrer is consistent with California law.

"Long before this country's founding, Indian tribes already existed as 'self-governing sovereign political communities,' each with their own distinct lands." (*United Auburn, supra,* 10 Cal.5th at p. 544.) Although the sovereignty of federally recognized tribes like the Rincon and the Chumash Bands has since been limited by the federal Constitution, they remain " 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." (*Stop the Casino 101 Coalition v. Brown* (2014) 230 Cal.App.4th 280, 287 (*Stop the Casino 101*); *United Auburn*, at p. 544 [federally recognized tribes "remain a 'separate people, with the power of regulating their internal and social relations' "].) While there is no doubt the individual tribe members have connections to one another based on a

25

shared history and culture that go beyond their status as members of a federally recognized tribe, the Tribes themselves nevertheless exist as sovereign governmental entities with the power to govern over their individual members and to enter into political discourse with other, similar sovereign entities. Accordingly, courts have compared federally recognized tribes to both individual states within the United States and foreign sovereign nations, while also recognizing the tribes, and their history, are unique. (See *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 247–248 (*Agua Caliente*); *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1192, fn. 3, 1195, fn. 7.)

Moreover, as courts have recognized, "[g]aming is a significant enterprise for Indian tribes — 'it cannot be understood as . . . wholly separate from the Tribes' core governmental functions,' " and is therefore a primary means by which Tribes assert their sovereign status. (*United Auburn, supra,* 10 Cal.5th at p. 545.) However, by enacting IGRA, Congress expressly sought to regulate at least some aspects of Indian gaming. (See IGRA, § 3; 25 U.S.C. § 2702(1), (2); *Hotel Employees*, *supra*, 21 Cal.4th at p. 595.) Because the sovereignty of federally recognized Indian tribes is limited primarily by federal law—both generally and specifically with respect to gaming—states, including the State of California, have limited ability to interfere with commercial activity on tribal land and California state courts have limited jurisdiction over tribes and entities that are considered arms of the tribes. (See *Agua Caliente, supra,* 40 Cal.4th at pp. 247–248 ["The general rule still holds that although Indian tribes are not immune from lawsuits filed against them by the United States, the Indian tribes' sovereign status affords them immunity from state jurisdiction."]; *Great Western Casinos, Inc. v. Morongo*

*Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1426 (*Great Western*) [finding claims related to a contract to manage tribal gaming operations preempted by federal law]; 25 U.S.C. § 2710(7)(A) ["The United States district court shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact."].)

At the same time, Congress has expressly granted California state courts with jurisdiction over individual tribal members as "private persons" in certain limited circumstances. (See 28 U.S.C. § 1360; *Bryan v. Itasca County, Minnesota* (1976) 426 U.S. 373, 383–385, fn. 10 [analyzing the legislative history and purpose of 28 U.S.C. § 1360 and concluding its reach is limited to civil litigation involving " ' "private persons or private property" ' " touching on, " 'the laws of contract, tort, marriage, divorce, insanity, descent, etc.' "].) Thus, there is a long history of both federal and California courts distinguishing between tribes, entities that are (and are not) considered arms of the tribes, and individual tribe members—just as the trial court did here— and placing limits on the jurisdiction of California state courts over each such category of litigants.

Specifically, with respect to the Tribes, the trial court did not misapprehend their status or how they exist, as Plaintiffs allege. Rather, the court recognized their unique status as sovereign governmental entities existing within the state, subject to federal oversight, and treated them accordingly. In doing so, the court concluded the Tribes, just like other *governmental* entities, are not "*private* persons" or "persons" within the context of the relevant unfair competition and public nuisance statutes. (See our discussion at Sections III.A. and IV.A., *post*.) That conclusion, however, was limited to the statutes at issue here.

27

Of course, to the Tribes' own benefit, the reverse also holds true—neither the State of California nor any associated governmental entity could use the public nuisance statutes or the UCL to seek redress of alleged harms associated with gaming activities on tribal land. "As a matter of federal law, absent congressional authorization or an Indian tribe's consent to suit, a federally recognized Indian tribe enjoys immunity from any suit in state court, even if the activity that is the subject of the lawsuit is purely commercial in nature or occurs on nontribal lands. [Citation.] That immunity extends to a tribe's for-profit business entities when the entity is operating on behalf of the tribe." (*Ameriloan v. Superior Court* (2008) 169 Cal.App.4th 81, 84–85 (*Ameriloan*); see also *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754 (*Kiowa Tribe*) ["As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."]; *Great Western, supra,* 74 Cal.App.4th at p. 1426 [claims related to tribal gaming operations brought in California state court preempted by federal law].) Thus, while their unique status as federally recognized Indian tribes may, at times, require them to seek redress through means other than state court litigation, that same status also protects the Tribes from intrusions by the state.

Contrary to the Tribes' and Amici Tribes' assertions of disparate treatment, the trial court's decision interprets the relevant statutes in a manner that treats the Tribes the same as any other non-tribal governmental entity. Just as the State of California cannot sue the Tribes or their affiliated entities operating gaming enterprises on tribal land under the public nuisance or UCL statutes, the Tribes cannot sue the commercial entities operating gaming enterprises on non-tribal land under those same statutes.

As we shall explain further, to hold otherwise could create inequities not intended by Congress or the California Legislature.

We now consider whether the SAC alleges facts sufficient to state a cause of action on behalf of any of the three separate categories of named plaintiffs. For the reasons set forth in detail below, we conclude that it does not, and that the trial court properly sustained the demurrer to the SAC.

## III.

### *Unfair Competition*

We turn first to the second and fourth causes of action for violations of the UCL, and consider whether the SAC adequately pleads that any of the named plaintiffs have standing to bring the asserted claims. We conclude it does not: The Tribes lack standing because they are not "persons" within the meaning of the UCL, the Tribe Entities also lack standing as "persons" insofar as they are "arms of the Tribes," and the SAC does not adequately plead that the Tribe Entities or Tribe Members suffered economic injury in fact. The trial court, therefore, properly sustained the demurrer as to the second and fourth causes of action.

A.  *The Tribes Lack Standing Because They Are Not "Persons" Within the Meaning of the UCL*

An action for unfair competition may be brought by a designated public prosecutor, including the Attorney General, a district attorney, a county counsel, and a city attorney, or "by a *person* who has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204, italics added.) Plaintiffs agree the Tribes are not one of the public prosecutors specifically authorized to enforce the UCL and, instead, assert they have standing as "persons" to file suit in their own names and on behalf of themselves.

29

The UCL, however, expressly defines "person" to "mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."  (Bus. & Prof. Code, § 17201.)  The Tribes are none of those things.  Instead, the Tribes are unique sovereign governmental entities, recognized by the federal government. (*Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1203; see also *Stop the Casino 101, supra,* 230 Cal.App.4th at p. 287 ["Federally recognized Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories."].)  "Since, in common usage, the term 'person' does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it."  (*U.S. v. Cooper Corp.* (1941) 312 U.S. 600, 604.)

Further, while the Unfair Practices Act, commencing with Business and Professions Code section 17000, defines " 'person' " to expressly *include* " 'municipal or other public corporation[s],' " the UCL, which was enacted *after* the Unfair Practices Act, omits this additional language, suggesting the legislature intended to exclude governmental entities from the definition. (*People for Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Bd.* (2005) 125 Cal.App.4th 871, 879 (*PETA*).)  "[H]ad the Legislature wanted to include governmental entities in its definition of 'person' for purposes of the UCL, it would have done so."  (*Ibid.*)

Not surprisingly, then, California courts have consistently held governmental entities are *not* "persons" within the meaning of the UCL, even when those entities are acting in a nongovernmental capacity.  (*Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308, 318 [city-chartered rent control board "is a government agency; it is none of the things included in the definition of person" under Business and Professions Code

section 17201]; *Janis v. Cal. State Lottery Com.* (1998) 68 Cal.App.4th 824, 831 (*Janis*) ["[g]overnment entities, such as [the California State Lottery Commission], are not included in [the] definition of person" under the UCL]; *PETA, supra,* 125 Cal.App.4th at p. 883 [state agricultural advisory board "not a 'person' who can be sued as a defendant under the UCL"]; *Cal. Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 551 ["the University of California is a 'public entity' (Gov. Code, § 811.2) and, therefore, not a 'person' within the meaning of the Unfair Practices Act"]; *Community Memorial Hosp. of San Buena Ventura v. County of Ventura* (1996) 50 Cal.App.4th 199, 209 [county not a "person" who could be sued for business practices of county-operated hospital under the UCL].)

Plaintiffs assert courts have found federally recognized tribes to be a " 'person' " in other contexts. (See *Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization* (9th Cir. 1985) 757 F.2d 1047, 1054 (*Chemehuevi*), revd. on other grounds (1985) 474 U.S. 9.) But *Chemehuevi* does not advance Plaintiffs' argument; it involved whether a tribe was a " 'person' " under the California Revenue and Taxation Code, not the UCL, and the tax law's definition of " 'person' " is far more expansive than the definition provided by the UCL. (*Id.* at p. 1054.) In finding that a tribe was a " 'person' " under the tax law, the Court of Appeals for the Ninth Circuit acknowledged the term " ' "person" ' " generally does *not* include sovereign entities, but found the legislature had explicitly created an exception by defining " '[p]erson' " using an expansive list that includes the "[s]tate, any county, city and county, municipality, district, or other political subdivision of the State, or any other group or combination acting as a unit." (*Id.* at pp. 1054–1055, 1058.)

Plaintiffs further assert courts have found other public entities to be "persons" within the meaning of other statutes, but these cases also do not

31

support Plaintiffs' position as the relevant statutes considered in those cases similarly involved a broader statutory definition of "person" in wholly different situations. (See *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190–1192, 1200–1201 (*Wells*) [concluding a school district was not a " 'person' " under the California False Claims Act (CFCA) (Gov. Code, § 12650 et seq.) but a charter school operated by a non-profit corporation was a " 'person[ ]' " because the CFCA explicitly included " 'corporations' "]; *Regents of the University of California v. Superior Court* (1976) 17 Cal.3d 533, 536 [finding University subject to usury laws as a " 'person, company, association or corporation' "]; *Fair Political Practices Com. v. Suitt* (1979) 90 Cal.App.3d 125, 129 [finding the state legislature to be a " 'person' " for purposes of the Political Reform Act, which includes an expansive definition of " 'person' "].)

Next, Plaintiffs assert the Tribes are not *just* sovereign governmental entities; they are also a "separate organized community of persons of Indian descent." As such, the Plaintiffs argue, the Tribes also fall within the definition of " 'person' " as an " 'organizations of persons' " under Business and Professions Code section 17201. While there is no doubt that Indian tribes "are groups of individuals of common Native American descent, rich and diverse in cultural tradition," this fact does not alter their status as sovereign governmental entities and the added phrase does not bring the Tribes within the statutory definition as any "other organizations of persons." (Bus. & Prof. Code, § 17201.)

As noted, the UCL defines "person" to "mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (Bus. & Prof. Code, § 17201.) Under the maxim *ejusdem generis* (of the same kind), "if a statute contains a list of

32

specified items followed by more general words, the general words are limited to those items that are similar to those specifically listed." (*Clark v. Superior Court* (2010) 50 Cal.4th 605, 614.) The phrase "and other organizations" is limited to things that are akin to those specifically enumerated in the statute—"natural persons, corporations, firms, partnerships, joint stock companies, associations," which are all private individuals and private entities. (Bus. & Prof. Code, § 17201.) We thus construe the UCL phrase "and other organizations of persons" to be limited to private organizations. Otherwise, a governmental entity could simply call itself "an organization of persons" to plead around its lack of standing to bring a private suit under the UCL, a result not intended by the Legislature.

*Wells* supports our construction of the phrase "and other organizations." In *Wells*, the California Supreme Court construed a similar statutory list under the CFCA which "defines covered 'persons' to 'include[ ] any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust.' (Gov. Code, § 12650, subd. (b)(5).)." (*Wells*, *supra,* 39 Cal.4th at p. 1190.) Our high court observed that "the only words and phrases [the list] uses are those most commonly associated with private individuals and entities." (*Ibid.*) In concluding a school district was not a "person" under the CFCA, the court stated that "[w]hile, in the broadest sense, a school district might be considered an 'association' or an 'organization,' the statutory list of 'persons' contains no words or phrases most commonly used to signify public school districts, or, for that matter, *any other public entities or governmental agencies*." (*Ibid.*, italics added.)

Further still, the unique status of the Tribes as federally recognized semi-sovereign " ' "domestic dependent nations" ' " weighs in favor of their

33

exclusion as "persons" able to bring suit against others under the UCL.  (See *Stop the Casino 101, supra,* 230 Cal.App.4th at p. 287.)  The UCL provides a single definition of "person," governing both *who may be sued* and *who may sue* for unfair competition.  (Bus. & Prof. Code, §§ 17201 ["*As used in this chapter*, the term person shall mean . . . ."  (Italics added.)], 17203 ["*Any person* who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."  (Italics added.)]; *County of Santa Clara v. Astra United States, Inc.* (2006) 428 F.Supp.2d 1029, 1034 ["California courts have uniformly found that governmental agencies were not within the above definition of 'person' in [Business and Profession Code] [s]ection 17201, which governs for both purposes."].)  Interpreting the term "person" in the UCL to include Indian tribes, as Plaintiffs urge, could have far-reaching unintended consequences.  To allow the Tribes to sue as "persons" would also subject the Tribes to be sued.

Thus, the same sovereign governmental status that precludes the Tribes from bringing suit against the cardrooms as a private "organization of persons" under the UCL also protects them from suits by others, including, for example, the Cardroom Defendants.  (See *Kiowa Tribe, supra,* 523 U.S. at p. 754 ["As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."]; *Ameriloan, supra*, 169 Cal.App.4th at p. 97 [finding tribal immunity extends to certain for-profit commercial entities that function as " 'arms of the tribes,' " including casino operators].)

But as noted, California state courts likely would not have jurisdiction over claims asserted *against* a tribe, or an entity acting as an "arm of the tribe," particularly in the context of tribal gaming, due to both the tribe's sovereign immunity and the doctrine of federal preemption.  (See *Lawrence v.*

*Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1368; *Ameriloan, supra,* 169 Cal.App.4th at p. 97; *Agua Caliente, supra,* 40 Cal.4th at pp. 247–248; *Great Western, supra,* 74 Cal.App.4th at p. 1426; 25 U.S.C. § 2710(7)(A).) As a result, if we were to decide the Tribes have standing as "persons" under the UCL, the Tribes would be permitted to use the statute as a sword against private California companies, while being shielded from such complaints themselves.[8] In the absence of an express statement to the contrary, we will not presume the California Legislature intended to create such inequities solely for American Indian tribes.

For these reasons, we conclude the Tribes are not "persons" as defined by Business and Professions Code sections 17201 and 17204 and, accordingly, they lack standing to bring a UCL claim against Defendants.

B. *The SAC Does Not Adequately Plead the Tribe Entities Have Standing as "Persons" Under the UCL*

Respondents assert that "because the Tribes are not 'persons' within the meaning of the UCL," the Tribe Entities "acting as arms of the Tribe are not either" and, therefore, also lack standing to sue under the UCL. The trial court agreed the Tribe Entities had not adequately pled standing as a "person" under the UCL, but did not specifically address the "arms of the

---

[8] We note in *Sonoma Falls Developers, LLC v. Dry Creek Rancheria Band of Pomo Indians* (N.D.Cal., July 24, 2002) 2002 U.S. Dist. LEXIS 29993—cited by Amici Tribes for the assertion that at least one court has found that Indian tribes qualify as an " 'association' " or " 'other organization of persons' " under the UCL—the Indian tribe in that litigation asserted sovereign immunity and argued "it is *not* a person as defined by [the UCL]" and therefore was not a proper defendant under the UCL. (*Id.* at * 10, italics added.) While we do not follow this district court's order, we mention it to highlight the Tribes' potential use of the UCL as a sword and shield if we were to adopt Plaintiffs' construction of the statute.

tribe" issue, or otherwise explain why the SAC failed to adequately allege the Tribe Entities were "persons" with standing under the UCL. At most, the court noted, in the context of the public nuisance cause of action, that the labeling of the Tribe Entities as " 'Rincon Entities' " and " 'Chumash Entities' " in the SAC suggests they are not a " 'private person.' " However, as our review is de novo, we are not limited by the trial court's analysis and, instead, conduct our own.

As an initial matter, we acknowledge the "arm of the tribe" analysis derives from a slightly different context, in which tribal business entities have asserted they share in the tribe's sovereignty. (See *People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 236 (*Miami Nation*) ["an entity asserting immunity bears the burden of showing . . . it is an 'arm of the tribe' entitled to tribal immunity"].) However, the basis for applying such immunity derives from the fact that the business entity at issue is entitled to the same protections of the tribe because it is operating on behalf of the tribe. (See *id.* at p. 250, quoting *Allen v. Gold Country Casino* (9th Cir. 2006) 464 F.3d 1044, 1046 (*Gold Country Casino*) ["The ultimate purpose of the inquiry is to determine 'whether the entity *acts* as an arm of the tribe so that its *activities* are properly deemed to be those of the tribe.' "]; *Ameriloan, supra,* 169 Cal.App.4th at p. 97 ["To properly decide whether the payday loan companies are entitled to the benefits of tribal sovereign immunity, the trial court must first determine whether those entities, in fact, are acting on behalf of federally recognized Indian tribes."].)

Here, we have determined the Tribes are not "persons" within the meaning of the UCL because they are governmental entities. To the extent the Tribe Entities are operating on behalf of the Tribes, such that their activities are properly deemed to be those of the Tribes, they are also

36

governmental entities, much like the state agricultural board in *PETA* and the state lottery commission in *Janis*, and are therefore similarly excluded from the definition of "person" under the UCL. (See *PETA, supra,* 125 Cal.App.4th at p. 883 [state agricultural advisory board "not a 'person' who can be sued as a defendant under the UCL"]; *Janis, supra,* 68 Cal.App.4th at p. 831 ["Government entities, such as [the California State Lottery Commission], are not included in [the] definition of person [set forth in the UCL]."].)

To determine whether a business entity is acting as an " 'arm of the tribe,' " courts consider the following five factors: "(1) the entity's method of creation, (2) whether the tribe intended the entity to share in its immunity, (3) the entity's purpose, (4) the tribe's control over the entity, and (5) the financial relationship between the tribe and the entity." (*Miami Nation, supra,* 2 Cal.5th at p. 236.) Of relevance here, in *Gold Country Casino*, *supra*, 464 F.3d 1044, the Courts of Appeal for the Ninth Circuit explained: "IGRA provides for the creation and operation of Indian casinos to promote 'tribal economic development, self-sufficiency, and strong tribal governments,' [Citation.] One of the principal purposes of . . . IGRA is 'to ensure that the Indian tribe is the primary beneficiary of the gaming operation.' " (*Id.* at p. 1046.) Accordingly, the court concluded, "there can be little doubt that [a] Casino [owned and operated by the tribe] functions as an arm of the [t]ribe." (*Id.* at p. 1047; see also *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs* (9th Cir. 2019) 932 F.3d 843, 856 [applying a similar analysis to a company created by a tribe specifically for the purposes of purchasing and operating a mine].)

Turning to the allegations in the SAC, two of the included entities are Harrah's Resort Southern California, "an unincorporated entity of the Rincon

Band" doing business on the Rincon Band reservation, and Chumash Casino and Resort Enterprise, "an unincorporated entity of the Chumash Band" doing business on the Chumash Band reservation. The classification of these entities, which appear to be casinos, as "unincorporated entit[ies] of [the Tribes]" leave "little doubt" that they are operating as arms of, and therefore on behalf of, the Tribes. (*Gold Country Casino, supra,* 464 F.3d at p. 1047.)

The SAC also names a number of other entities of various types including two hotels, two gas stations, a vineyard, and a cellar, one of which is a "tribally chartered" corporation and all of which allegedly conduct business off tribal land. After identifying the various corporate structures of these entities, the SAC states, "[a]side from their affiliation with or being operated by [the Tribes]," they *all* operate in "the same manner as other corporations, limited liability companies, and unincorporated entities." Plaintiffs argue we must accept this allegation as true—and that the trial court failed to do so—but, even doing so, this single conclusory statement, which groups together a variety of types of business entities, provides very little information regarding the operation of those entities and to what extent they are operating independently of or on behalf of the Tribes.

Thereafter, and regardless of their corporate structure, the SAC repeatedly asserts *all* of the Tribe Entities, as a collective group: 1) offer gaming of the type only the Tribes are allowed to offer, and 2) receive gaming revenue reserved for the Tribes under IGRA. More specifically, the SAC alleges, "under Proposition 1A, *Indian tribes* are the only entities allowed to offer banked card games," but also that the Cardroom Defendants "divert[ ] revenue from lawful gaming of the type only *[Tribe] Entities* and those similarly situated may offer." (Italics added.) In addition, the prior versions

38

of the complaint alleged the diverted revenue was "governmental revenue" or "tribal revenue," and that "every dollar of lost revenue is a dollar lost in those *governmental* programs and services," further suggesting that, to the extent the revenue at issue is generated by Tribe Entities, those entities are acting on behalf of the Tribe. (Italics added.) Although these allegations were subsequently deleted, it was done without explanation, and may still be considered when testing the sufficiency of the SAC. (See *Shoemaker, supra,* 52 Cal.3d at p. 12; *Pierce, supra,* 1 Cal.App.4th at p. 1109 [" 'A pleader may not attempt to breathe life into a complaint by omitting relevant facts which made his previous complaint defective.' "].)

Accepting *these* allegations as true with respect to all of the Tribe Entities, the SAC certainly suggests that there is a close financial relationship between the Tribes and Tribe Entities, that the purpose of the Entities is tied to a core government function of the Tribes, and that the Tribes intended to share their immunity with the Tribe Entities. (See *United Auburn, supra,* 10 Cal.5th at p. 545 [gaming is a significant enterprise for tribes that cannot be understood as " 'wholly separate from the Tribes' core governmental functions' "].) As plead in the SAC, the Tribe Entities' activities do not appear " 'so far removed from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself.' " (*Miami Nation*, *supra*, 2 Cal.5th at p. 250.)

Plaintiffs argue they do not need to plead facts establishing the Tribe Entities are *not* arms of the Tribe because there is no presumption that they are. Plaintiffs nevertheless have an obligation to plead facts establishing the threshold issue of standing. (See *Mendoza, supra,* 6 Cal.App.5th at p. 810.) Here, the Tribe Entities were first added to the FAC in an apparent effort to overcome the trial court's initial ruling that the Tribes did not have standing

39

because they are governmental entities and therefore not "persons" under the UCL. And the allegations in the SAC *at least* suggest the Tribe Entities are acting as arms of the Tribes and, therefore, do not have standing as "persons" under the UCL. To the extent any particular Tribe Entity is *not* acting as an arm of the Tribe by offering gaming of the type only the Tribes are lawfully permitted to offer and receiving gaming revenue exclusively belonging to the Tribes under IGRA, the SAC does not adequately allege they suffered an economic injury in fact based on any other theory and, as we explain next, they would lack UCL standing on that additional basis.

C.    *The SAC Fails to Adequately Plead the Tribe Entities and Tribe Members Suffered Economic Injury in Fact*

The UCL "previously authorized any person acting for the general public to sue for relief from unfair competition. (Bus. & Prof. Code, former § 17204, as amended by Stats. 1993, ch. 926, § 2, p. 5198 (former section 17204)[.])" (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 (*California for Disability Rights*).) Former Business and Professions Code section 17204 authorized " 'any person acting for the interests of itself, its members or the general public' . . . to file a civil action for relief. Standing to bring such an action did not depend on a showing of injury or damage." (*California for Disability Rights*, at p. 228.) In 2004, however, voters passed Proposition 64 with the express purpose of "materially curtail[ing] the universe of those who may enforce" the UCL in a private action by "confin[ing] standing to those actually injured by a defendant's business practices[.]" (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320–321 (*Kwikset*).) To satisfy the narrower standing requirement, "a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair

40

business practice or false advertising that is the gravamen of the claim." (*Id.* at p. 322.)

The "injury in fact" requirement incorporates the established federal meaning of that phrase. (*Kwikset*, *supra*, 51 Cal.4th at p. 322.) Under federal law, an injury in fact "is 'an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]' " ' " (*Ibid.*) " 'Particularized' in this context means simply that 'the injury must affect the plaintiff in a personal and individual way.' " (*Id.* at p. 323.) In addition to requiring "injury in fact," the UCL requires that the "injury be economic" (*id.* at p. 324), that is, it must take the form of "lost money or property" (Bus. & Prof. Code, § 17204; *Kwikset*, at p. 324). The requirement that the "injury be economic renders standing under [Business and Professions Code] section 17204 substantially narrower than federal standing under article III, section 2 of the United States Constitution, which may be predicated on a broader range of injuries." (*Kwikset*, at p. 324.) Thus, "in sharp contrast to the state of the law before passage of Proposition 64, "a private plaintiff filing suit now must establish that he or she has *personally* suffered" economic injury in fact caused by the alleged unfair competition. (*Id.* at pp. 322–323, italics added.)

As first pled in the original complaint, Plaintiffs alleged *the Rincon Band* lost at least $13.8 million per year and *the Chumash Band* lost at least $4.42 million per year in "*governmental revenue*," from 2013 to 2017, as a result of gaming being diverted from tribal casinos to illegal non-tribal cardroom operations. (Italics added.) In the FAC, Plaintiffs deleted "governmental revenue" and asserted that *all plaintiffs,* including the Tribes, Tribe Entities and Tribe Members, were collectively deprived of those same amounts in "tribal revenue." In the SAC, Plaintiffs reasserted the claim but

41

this time, all plaintiffs were deprived of those same amounts in "[g]aming [r]evenue." Regardless of the term Plaintiffs use, however, the gaming revenue at issue is synonymous with "net revenue" as defined by IGRA and belongs solely to the Tribes.

The SAC expressly alleges the "[T]ribes are the only entities allowed to offer banked card games" and that Defendants' illegal non-tribal gaming deprives the *Tribes* of additional annual gaming revenue. And as Plaintiffs point out, the gaming revenue is distributed pursuant to a Revenue Allocation Plan, which requires that all such revenue be used for one of five purposes specifically enumerated in IGRA. (See 25 U.S.C. § 2710(b)(2)(B).) Notably, IGRA defines " 'net revenues' " as "gross revenues of an Indian gaming activity less amounts paid out as, or paid for, prizes and total operating expenses, excluding management fees," and states that "net revenues from any tribal gaming are not be used for purposes other than" the five enumerated purposes. (25 U.S.C. §§ 2703(9), 2710(b)(2)(B).) The very same section of IGRA states, "except as provided in paragraph (4) [relating to licenses for class II gaming], the Indian tribe will have the *sole proprietary interest* and responsibility for the conduct of any gaming activity." (25 U.S.C. § 2710(b)(2)(A), italics added.)

The fundamental flaw with the SAC is that it fails to acknowledge the gaming revenue belongs *exclusively* to the Tribes and, therefore, fails to provide any meaningful discussion regarding the flow of that revenue—and, in particular, the flow of any *additional* revenue the Tribes may receive in the absence of the alleged illegal cardroom operations—to the Tribe Entities or Tribe Members. (See *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 (*Moore*) ["We do not . . . assume the truth of contentions, deductions, or conclusions of fact or law."]; accord *Blank, supra,* 39 Cal.3d at

42

p. 318.) The SAC does not correct this flaw with the additional allegation that, "[b]ecause they fall within the only class of individuals to enjoy revenue from banked card games in California, *all Plaintiffs* suffer direct and indirect losses from the . . . illegal gaming activity" and "[s]uch injury is traceable to each individual plaintiff by virtue of the Revenue [Allocation] Plan." Without more, these conclusory statements are not sufficient to establish that the specific Tribe Entities or Tribe Members *personally* suffered economic injury in fact, separate and apart from the Tribes, who maintain the sole proprietary interest in the underlying gaming revenues. (See *Moore,* at p. 125; *Blank,* at p. 318; 25 U.S.C. § 2710(b)(2)(A).)

The SAC alleges "[p]ursuant to IGRA and the Revenue Allocation Plans, distributions of [g]aming [r]evenue are made directly to the [Tribe Members]" and "portions of the [g]aming [r]evenue are allocated to and retained by the [Tribe Entities] to fund operations and infuse capital into their business." However, the SAC does not include any allegations indicating either the Tribe Members or the Tribe Entities would receive any *additional* per capita cash distributions or portions of the gaming revenue in the absence of competition from Defendants. To the contrary, as the SAC acknowledges, the Tribes could use any additional gaming revenues for other purposes, including to fund the operations of tribal government or local government agencies or for charitable giving.

On appeal, Plaintiffs assert "[t]he SAC further alleges the Tribe Members are *deprived of* properly-funded general welfare programs, health insurance, life insurance, educational scholarships, financial assistance, youth programs, housing programs, employment opportunities." But the

43

SAC does not actually include any such allegation[9] and, even if it did, we question whether lost or diminished government programs and services are "money or property" under the UCL. (See *Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 244, disapproved of on other grounds in *Kwikset, supra,* 51 Cal.4th 310 ["Ordinarily when we say someone has 'lost' money we mean that he has parted, deliberately or otherwise, with *some identifiable sum* formerly belonging to him or subject to his control; it has passed out of his hands by some means, such as being spent or mislaid, or ceded in a gamble, bad loan, or investment. Similarly, when we say someone has 'lost' property we mean that he has parted with *some particular item of property* he formerly owned or possessed; it has ceased to belong to him, or at least has passed beyond his control or ability to retrieve it." (Italics added.)].)

Essentially, Plaintiffs ask us to draw—from the contention that the Tribe Entities and Tribe Members benefit in *some ways* from *some portion* of the overall revenues—the conclusion that they are then personally harmed by *any reduction* in the overall gaming revenues received by the Tribes. But we

---

9    To support this assertion, Plaintiffs rely on paragraphs 116 through 122 of the SAC. Therein, the SAC alleges that gaming revenue is allocated to the *Tribes* "to fund Tribal government operations, general welfare programs, charitable contributions, health insurance, life insurance, educational scholarships, financial assistance, youth summer programs, housing programs, employment opportunities, and per capita cash distributions," and that the Tribe Members *rely on* at least some of those programs. These allegations do not suggest any of the Tribe Members were actually deprived of any programs or services. As discussed, *ante*, the gaming revenue belongs to the Tribes and the Tribes could have used any additional revenues in any of the enumerated ways, including, for example, charitable giving. (25 U.S.C. § 2710(b)(2)(A).)

do not assume the truth of contentions, deductions or conclusions of fact in reviewing the sufficiency of the complaint. (*Moore*, *supra*, 51 Cal.3d at p. 125; *Blank*, *supra*, 39 Cal.3d at p. 318.) Additional *factual* allegations are required to establish that connection. (See, e.g., *Bower v. AT&T Mobility, LLC* (2011) 196 Cal.App.4th 1545, 1554 [plaintiff failed to adequately allege injury-in-fact where complaint alleged loss of ability to "shop around" but did not allege plaintiff actually could have obtained same service at a lower price from another source]; *Hall v. Time, Inc.* (2008) 158 Cal.App.4th 847, 851, 854 [allegations plaintiff was improperly billed for a book insufficient to establish injury in fact where plaintiff did not allege he would not have bought the book or would have paid less otherwise]; *Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105, 115 [allegation insurance broker was unlicensed insufficient to establish injury in fact where plaintiff did not allege value of policy was less than what was paid].) Plaintiffs cannot, as they do, rely upon conclusory statements indicating *all* of the plaintiffs suffer economic injury in fact as a result of every dollar allegedly lost by the Tribes.

In sum, we conclude the SAC fails to adequately plead standing on behalf of any named plaintiff to assert an unfair competition claim against any of the named defendants. The trial court properly sustained the demurrer as to the second and fourth causes of action.

IV.

*Public Nuisance*

We turn next to the first and third causes of action, and consider whether the SAC adequately pleads that any of the named plaintiffs have standing to bring a claim for public nuisance. For many of the same reasons discussed with respect to the UCL causes of action, we conclude that it does

45

not and the trial court properly sustained the demurrer as to the public nuisance claims.

A.      *The Tribes and Tribe Entities Are Not "Private Persons" Under Civil Code Section 3493*

A public, as opposed to private, nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) Actions for public nuisance are "aimed at the protection and redress of *community* interests" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103 (*Acuna*)), and therefore, as a general rule, only public prosecutors authorized by statute may sue for a public nuisance on behalf of the community. (Civ. Code, § 3494; Code Civ. Proc., § 731.) However, Civil Code section 3493 provides: "A *private person* may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." (Italics added; see also, Code Civ. Proc., § 731 ["An action may be brought by any *person* whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code." (Italics added.)].)

The trial court ruled the Tribes and Tribe Entities lack standing to sue for public nuisance because they are not "private persons" under Civil Code section 3493. In challenging the court's ruling, Plaintiffs assert largely the same arguments they made with respect to their assertion of standing under the UCL. Our conclusion is also the same: just as they are not "persons" under the UCL, the Tribes and Tribe Entities are not "private persons" under the public nuisance statutes.

As with the UCL, the phrase "private person" in Civil Code section 3493 does not include a governmental entity. (*City of Los Angeles v. Shpegal-Dimsey, Inc.* (1988) 198 Cal.App.3d 1009, 1020 ["Civil Code section 3493

46

provides no authority for plaintiff, a public entity rather than a private party, to recover damages for a 'specially injurious' public nuisance."]; accord *Torrance Redevelopment Agency v. Solvent Coating Co.* (C.D.Cal. 1991) 763 F.Supp. 1060, 1065.) Further still, the term "person" in Code of Civil Procedure section 731, which is part of the same statutory scheme on public nuisance, does not include a governmental entity. (*County of San Luis Obispo v. Abalone Alliance* (1986) 178 Cal.App.3d 848, 860 [" 'It is clear that the Legislature intended that one type of litigant [" 'a person' "] could seek abatement *and* damages, while the other type of litigant [a designated public prosecutor bringing suit on "behalf of the people" of the State of California] could obtain abatement [under Code of Civil Procedure section 731] only. A city attorney, in an action 'brought in the name of the people,' fits squarely and *exclusively* in the latter classification.' " (Second italics added.)].)

Moreover, as the California Supreme Court has explained, the public nuisance doctrine has, historically, been "aimed at the protection and redress of *community* interests." (*Acuna*, *supra*, 14 Cal.4th at p. 1103.) As such, California law authorizes public prosecutors to bring an action on behalf of the public to abate a public nuisance, but only *within their own community* where the nuisance exists. (Code Civ. Proc., § 731 [abatement action "in the name of the people of the State of California" may be brought by "the district attorney or county counsel of any county *in which the nuisance exists*, or by the city attorney of any town or city *in which the nuisance exists*" (italics added)]; see also *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 304, fn. 5 ["Since this cause of action was brought solely by Santa Clara, S[an] F[rancisco] and Oakland, it could seek abatement of properties affected only within those communities—not throughout the State

47

of California."].)  There is no similar jurisdictional limit on a private action to abate a public nuisance brought by a private person.

The Tribes, as sovereign domestic dependent nations, have inherent sovereign authority but only over their members and territories.  (See *Stop the Casino 101, supra*, 230 Cal.App.4th at p. 287.)  Thus, the Tribes, just like any other governmental entity, would have authority to address any alleged nuisance presented by banked card games within their own communities.  However, permitting the Tribes to seek redress of an alleged public harm that is *not* within their own jurisdiction, by bringing a public nuisance claim as a "private person," would circumvent the clear jurisdictional limits on governmental entities set forth in Code of Civil Procedure section 731.

For all these reasons, we conclude the Tribes are not "private person[s]" with standing to assert a public nuisance claim under Civil Code section 3493 or Code of Civil Procedure section 731.  For the same reasons the SAC fails to adequately plead the Tribe Entities are "persons" under the UCL (see Section III.B, *ante*), we conclude the SAC fails to adequately plead the Tribe Entities are "private persons" with standing to sue under the public nuisance statutes.  Moreover, as we explain next, the SAC also does not adequately allege the Tribe Entities, or any plaintiff, suffered a special harm while exercising a right common to the general public, and they would lack standing to sue for public nuisance on that additional basis.

B.    *All Plaintiffs Fail to Adequately Plead They Suffered a Special Harm While Exercising a Right Common to the General Public*

To have standing to pursue a public nuisance as a private person, the plaintiff must adequately allege the existence of a nuisance affecting the community at large, and also that they sustained a special injury, distinct in some way from the more general public harm.  (Civ. Code, §§ 3480, 3493.)  "The genesis of this rule is found in the common law which recognized that

48

'the action would lie if the plaintiff could show that he had suffered special damage over and above the ordinary damage caused to the public at large by the nuisance.' " (*Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 123–124.)

The SAC alleges the Cardroom Defendants' gaming establishments constitute a nuisance per se pursuant to Penal Code section 11225, subdivision (a)(1) because they offer banked gaming on non-tribal land in violation of state law. Those allegations are sufficient to establish the first requirement, the existence of a nuisance affecting the community at large. (See *City of Costa Mesa v. Soffer* (1992) 11 Cal.App.4th 378, 382 [" 'Nuisances *per se* are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance.' "].)

However, the SAC does not allege facts sufficient to meet the second requirement, that the plaintiffs sustained a special injury. Plaintiffs rely on the same allegations in the SAC as they did with respect to the UCL to assert they sustained the requisite special injury, and claim they each were harmed as a result of the reduction in gaming revenue caused by the Cardroom Defendants' allegedly illegal gaming. The trial court found the SAC did not adequately allege Plaintiffs suffered from the "same harm" as the general public because they are " 'not near' " or in " 'close proximity' " to the communities where the Cardroom Defendants operate, and also failed to allege the nuisance was specially injurious to the Tribe Entities or Tribe Members. Although we would state the first point somewhat differently, we agree Plaintiffs failed to adequately plead a special injury under the public nuisance statutes for two reasons: 1) the harms alleged were not sustained while exercising a right common to the general public and therefore are not of the type the public nuisance law intends to address, and 2) for the same

49

reasons as stated with respect to the UCL claims, the Tribe Entities and Tribe Members have not adequately pled the nuisance was specially injurious to them.

First, the special harms Plaintiffs allege are not the type of harms the public nuisance statutes are intended to protect. As we have explained, the public nuisance doctrine in California is "aimed at the protection and redress of *community* interests." (*Acuna, supra,* 14 Cal.4th at p. 1103.) To avoid a multiplicity of actions regarding the invasion of such common rights, public nuisances are generally remedied by designated public prosecutors, with a limited exception for suits by private individuals in exceptional circumstances. (See Rest.2d Torts*,* § 821C(1) (Restatement); Civ. Code, § 3493.)

"In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public *exercising the right common to the general public that was the subject of interference.*" (Restatement, § 821C(1), italics added.) Further, Code of Civil Procedure section 731 confers standing only on private persons, as opposed to the enumerated public prosecutors, "whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance." The harms stated in the statute—injury to property or the personal enjoyment thereof—are the types of harms one would expect those in the community affected by the alleged nuisance to suffer. Thus, although a private plaintiff must have suffered a harm over and above the general public, the plain language of the statute suggests those harms must be of the same *type* as those suffered by the members of the general public subject to the interference.

50

Indeed, a survey of California cases, where courts have found the special harm element has been met, indicates the special harms are generally of the type suffered while exercising the right common to the general public that is the subject of the interference. (See, e.g., *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1137–1138 [special injury where pollution required building owner to undertake testing for hazardous conditions]; *Wade v. Campbell* (1962) 200 Cal.App.2d 54, 59–60 [special injury where noxious gas from dairy farm caused nauseating odors and mosquito and fly infestations on adjacent lands].) Based on these same principles, the court in *Philadelphia Elec. Co. v. Hercules, Inc.* (3d Cir. 1985) 762 F.2d 303 (*Philadelphia Elec. Co.*), found the plaintiff had not adequately alleged a special harm because there was no allegation the plaintiff "suffered [the alleged] harm 'exercising the right common to the general public that was the subject of interference.' " (*Id.* at p. 316; accord *Reudy v. Clear Channel Outdoor, Inc.* (9th Cir. 2009) 356 Fed.Appx. 2, 4 (*Reudy*) ["[T]he [special] harm must be one emanating from the same cause, such as diminution in safety or aesthetics, however. Nuisance law is not designed to benefit disadvantaged competitors."].) Although not binding on this court, we find the court's reasoning in *Philadelphia Elec. Co.* compelling.

Here, the allegations in the SAC, read as a whole, demonstrate the Plaintiffs are not seeking to protect the rights of the community at large, and are not alleging a special harm of the type suffered while exercising the right common to the general public that is the subject of the interference. (See *Acuna, supra,* 14 Cal.4th at p. 1103; *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 749; *Philadelphia Electric Co., supra*, 762 F.2d at p. 316.) Instead, they seek to protect the Tribes' own exclusive rights to offer gaming of the very same type they claim is injurious to the general public,

and the right of the Tribe Entities and Tribe Members to profit from that exclusive right. This runs contrary to the purpose of public nuisance laws, which are "not designed to benefit disadvantaged competitors." (*Reudy, supra,* 356 Fed.Appx. at p. 4.)

If the Tribes, the Tribe Entities, or their individual members, wish to address the injurious nature of class III gambling within their own community, they are not without recourse to do so. (See *United Auburn, supra,* 10 Cal.5th at p. 545 [" 'Gaming . . . represents a stand for political independence as tribes assert their sovereign right to determine for themselves what they can control on tribal lands.' "]; 25 U.S.C. § 2710(d)(5) ["Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands."].) They do not, however, have standing under the California state public nuisance statutes to address an alleged loss of competitive revenue as a result of unregulated gambling on non-tribal land.

Second, even if we were to accept the loss of competitive gaming revenue as the type of special harm required by the public nuisance statutes, the SAC fails to adequately allege either the Tribe Entities or the Tribe Members personally suffered as a result of that lost revenue. For all the same reasons we have discussed with respect to the UCL (see Section III.C., *ante*) those allegations are equally insufficient with respect to their public nuisance claims. Plaintiffs cannot, as they do, rely upon conclusory statements indicating *all* of the plaintiffs *personally* sustained special harms as a result of gaming revenue belonging to and allegedly lost by the Tribes. (See *Moore, supra,* 51 Cal.3d at p. 125; *Blank, supra,* 39 Cal.3d at p. 318.)

Finally, we acknowledge the SAC alleges 10 of the 12 Tribe Members live in "close proximity" to the Cardroom Defendants, such that they may

suffer some of the same harms as the community at large. As an initial matter, Plaintiffs added those allegations to the SAC only after the trial court found, "the locations [where the Tribe Members reside] are throughout California (from San Diego to Santa Barbara), with many of the tribal member plaintiffs residing hundreds of miles from many of the cardrooms." The SAC does not define "in close proximity," though, and, in fact, alleges Tribe Members residing in several different cities (and counties) are in "close proximity" to the same cardrooms.[10] Regardless, the Tribe Members do not allege they suffered the requisite special harm as a result of living close to the cardrooms. Instead, they rely on the same alleged lost gaming revenue as the Tribes and Tribe Entities.

Thus, despite two opportunities to amend the complaint, Plaintiffs have failed to allege facts sufficient to establish that any of them have personally suffered a special harm of the type the public nuisance statutes are intended to redress. Accordingly, we conclude Plaintiffs lack standing to assert a public nuisance claim against any defendant and the trial court properly sustained the demurrer as to the first and third causes of action of the SAC.

V.

*Injunctive and Declaratory Relief*

In the fifth and sixth causes of action, Plaintiffs seek injunctive and declaratory relief based on Defendants' alleged violation of article IV, section 19(e), Penal Code sections 330.11, and 11225, subdivision (a)(1). As the trial court did, we conclude these equitable claims fail for two reasons: First,

_____

10    For example, the four Tribe Members named in paragraphs 5, 10, 11 and 13 of the SAC reside in Temecula, Los Angeles, Torrance, and Santa Ana, respectively, and yet all four are alleged to reside in "close proximity" to the Hawaiian Gardens Casino.

article IV, section 19(e) is not self-executing or directly judicially enforceable and therefore does not give rise to a claim for injunctive or declaratory relief. Second, a private party may not seek enforcement of the penal law through a declaratory action.

A.  *Article IV, Section 19(e) Is Not Self-Executing or Directly Judicially Enforceable*

A plaintiff cannot state a cause of action for a violation of a constitutional provision that is not self-executing or directly judicially enforceable.  (See *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 721 (*Bautista*).)  A constitutional provision is self-executing and, thus, the source of a judicially enforceable right, if it "is so complete with respect to the nature of the right and the means to enforce it that no further action by the Legislature is necessary." (*Ibid.*)  Where a constitutional provision is *not* self-executing, "[t]he Legislature must act to fulfill its constitutional mandate . . . and the judicially enforceable rights are the laws it enacts."  (*Id.* at p. 729.)

"A constitutional provision 'will . . . be presumed to be self-executing, and will be given effect without legislation,' unless a contrary intention is clearly expressed." (*Bautista, supra*, 201 Cal.App.4th at p. 725.)  The plain language of article IV, section 19(e) expresses such a contrary intention.  Article IV, section 19(e) provides:  " '*The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey.*' " (Italics added.)  The constitutional provision states a "fundamental public policy against the legalization in California of casino gambling." (*Hotel Employees*, *supra*, 21 Cal.4th at p. 589.)  A public policy statement "does not create an affirmative duty on the part of the state" but " ' " ' "merely indicates principles, without laying down rules by means of which those principles may be given the force of law." ' " ' " (*Bautista*, at pp. 726–728.)  By its express terms, article IV, section 19(e) requires further

54

legislative action to prohibit casino-style gambling.  We therefore conclude article IV, section 19(e) is not self-executing or directly judicially enforceable.

The California Supreme Court has found a nearly identical constitutional provision was not self-executing.  In *California Gasoline Retailers v. Regal Petroleum Corp.* (1958) 50 Cal.2d 844 (*California Gasoline Retailers*), our high court examined former article IV, section 26 of the California Constitution, which provided:  " 'The Legislature shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale in this State of lottery or gift enterprise tickets or tickets in any scheme in the nature of a lottery.' " (*Id.* at p. 848.)  The Court concluded the antilottery provision "evidences a strong public policy against lotteries in this state" but "it was obvious from the language [itself] that it is not a 'self-enforcing' or 'self-executing' provision." (*Ibid.*)  "The language shows that it was intended that the Legislature should have no power to authorize lotteries by legislation and that it was to enact legislation prohibiting lotteries." (*Ibid.*)

"[S]ection 19(e), the anticasino provision, parallels in language, and was presumably based upon, the preexisting antilottery provision of [the] California Constitution." (*Hotel Employees, supra,* 21 Cal.4th at p. 603.)  Like the antilottery provision, then, article IV, section 19(e) is not self-executing and cannot properly form the basis for Plaintiffs' fifth and sixth causes of action for injunctive and declaratory relief.  (See *Bautista, supra,* 201 Cal.App.4th at p. 729 [affirming a judgment of dismissal of claim for injunctive and declaratory relief premised on article XIV, section 4 of the California Constitution, which grants the Legislature plenary power to create the workers' compensation system, because the provision is not self-executing and not the source of an independently judicially enforceable right].)  Instead,

it is the laws enacted by the Legislature to enforce article IV, section 19(e) that are judicially enforceable.  (*Bautista*, at p. 729.)

Plaintiffs assert the trial court's conclusion that article IV, section 19(e) is not self-executing is incorrect as a matter of law.[11]  Relying on *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300 (*Katzberg*), Plaintiffs argue "California case law provides that injunctive and declaratory relief remedies are available for *any breach* of a Constitutional provision" and the California Supreme Court in *Hotel Employees* "stepp[ed] in to disallow gambling that violates" article IV, section 19(e), suggesting it is self-executing and independently judicially enforceable.  (Italics added.)  We disagree.  Plaintiffs have misconstrued both *Katzberg* and *Hotel Employees*.

The Court in *Katzberg* did not hold *any* constitutional violation gives rise to a claim for equitable relief.  The Court noted that article I, section 26 of the California Constitution provides that " 'all branches of government are required to comply with constitutional directives [citations] or prohibitions,' " and, as it previously observed in an 1886 decision, " '[e]very constitutional provision is self-executing *to this extent*, that everything done in violation of it is void.' "  (*Katzberg*, *supra*, 29 Cal.4th at pp. 306–307, quoting *Oakland Paving Co. v. Hilton* (1886) 69 Cal. 479, 484.)  After finding the due process clause of article I, section 7(a) *is* self-executing because—"even without any

11    Although Plaintiffs did not explicitly concede the point, the trial court was correct that Plaintiffs did not dispute Defendants' assertion that article IV, section 19(e) is not self-executing in their briefing on the demurrer. Instead, Plaintiffs relied upon Business and Professions Code section 17203 and Penal Code sections 330.11 and 11225, subdivision (a) to assert the equitable claims were "tethered to and authorized by California law."  Thus, Plaintiffs have likely waived their claim that the trial court erred as a matter of law in concluding article IV, section 19(e) is not self-executing.

56

effectuating legislation"—all branches of government are required to comply with its terms, the Court found that "it also is clear that, like *many other constitutional provisions*, this section supports an action, brought by a private plaintiff against a proper defendant, for declaratory relief or for injunction." (*Katzberg,* at pp. 306–307, italics added.)  The phrase "many other constitutional provisions" does not mean "all constitutional provisions." Plaintiffs' interpretation of *Katzberg* that all constitutional provisions are self-executing is not only incorrect; it ignores the Court's earlier finding in *California Gasoline Retailers* that the antilottery provision is not self-executing.  (*California Gasoline Retailers*, *supra*, 50 Cal.2d at p. 848.)

The Court in *Hotel Employees* also did not hold article IV, section 19(e) is self-executing or directly judicially enforceable.  It found Proposition 5 violated article IV, section 19(e) and granted a writ of mandate directing the Governor and public officials "not to implement" the invalid initiative.  (*Hotel Employees, supra,* 21 Cal.4th at pp. 615–616.)  To the extent Plaintiffs assert the *Legislature* violated the California Constitution by enacting any law in violation of the anticasino provision, including Penal Code section 330.11—a contention they did not make in the trial court—their remedy would similarly lie by way of writ, and not a civil action against a private party.

Further relying on *Katzberg*, Plaintiffs assert the analysis of whether article IV, section 19(e) is self-executing is irrelevant to the viability of their equitable claims because it applies only where monetary damages are sought with injunctive or declaratory relief.  Plaintiffs again misconstrue *Katzberg*. "The question presented [in *Katzberg*] [wa]s *whether . . . plaintiff may maintain an action for monetary damages* to remedy the asserted violation of his due process liberty interests under article I, section 7(a), on the facts alleged."  (*Katzberg*, *supra*, 29 Cal.4th at p. 307, italics added.)  The Court

noted: " '[T]he argument over damages is cast [occasionally] in terms of whether the clause is "self-executing." However, [the self-executing issue] truly concerns the question whether a clause is *judicially* enforceable at all, and does not automatically answer the question whether damages are available for enforceable clauses.' " (*Id*. at p. 307, fn. 4.) Since the issue before the Court was whether the plaintiff could maintain an action for monetary damages—not whether there is a judicially enforceable right in the first instance—the Court "believe[d] it potentially confusing to employ the 'self-executing' terminology *in this context*" and declined to do so to avoid confusion. (*Ibid*.) Our sister court in *Bautista* recognized this point and rejected, as we do, Plaintiffs' argument that the "self-executing analysis differs depending upon the relief sought." (*Bautista, supra*, 201 Cal.App.4th at p. 728.)

Plaintiffs' reliance upon additional cases to assert "California case law provides that injunctive and declaratory relief remedies are available for any breach of a Constitutional provision, even when a damages remedy is not allowed," is equally misplaced. Each of those cases dealt with constitutional violations by a state actor. (See *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194; *White v. Davis* (1975) 13 Cal.3d 757; *Clausing v. San Francisco Unified School Dist*. (1990) 221 Cal.App.3d 1224.)

Having determined that article IV, section 19(e) is not self-executing or directly judicially enforceable, we conclude there is no basis for Plaintiffs' assertion of the fifth and sixth causes of action for equitable relief.

B.     *Equitable Relief Is Not Available to Enforce a Penal Law*

Plaintiffs also sought a judicial declaration that Defendants violated Penal Code sections 330.11 and 11225, subdivision (a)(1). As a matter of law, equitable relief is not available to enforce a penal law. It is a " 'well-established doctrine that equity will not ordinarily restrain the violation of a

penal law.' " (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1130–1132 (*Leider*); *International Assn. of Cleaning & Dye House Workers v. Landowitz* (1942) 20 Cal.2d 418, 421.) "Equity is loath to interfere where the standards of public policy can be enforced by resort to the criminal law" because granting an equitable remedy for a criminal violation would have "the collateral effect of depriving a defendant of the jury trial to which he would be entitled in a criminal prosecution for violating exactly the same standards of public policy." (*People v. Lim* (1941) 18 Cal.2d 872, 880.)

Accordingly, actions in equity to restrain a violation of a penal law require specific authorization, "in the absence of which it must be held that the complaint fails to state a cause of action." (*Leider, supra,* 2 Cal.5th at p. 1132.) Consistent with that doctrine, Civil Code section 3369 provides, "[n]either specific nor preventive relief can be granted . . . to enforce a penal law, except in a case of nuisance or as otherwise provided by law."

Plaintiffs assert the Penal Code vests the trial court with broad authority to abate illegal gambling operations, but the statutes they rely upon all refer to abatement of a nuisance and, thus, as the trial court noted, the claims derive from the underlying public nuisance claims. (See, e.g., Pen. Code, §§ 11225, subd. (a)(1) ["Every building or place used for the purpose of illegal gambling . . . is a nuisance which shall be enjoined, abated, and prevented, and for which damages may be recovered, whether it is a public or private nuisance."], 11227, subd. (a) ["Whenever the existence of a nuisance is shown in an action brought under this article . . . the court or judge shall allow a temporary restraining order or injunction to abate and prevent the continuance or recurrence of the nuisance."], 11230 ["If the existence of a nuisance is established in an action as provided in this article, an order of abatement shall be entered as a part of the judgment in the case."].) As we

59

have discussed, *ante*, an appropriately designated public prosecutor could bring a claim seeking to abate any such nuisance, but Plaintiffs have not adequately alleged standing as private parties to do so here.

Absent a constitutional basis for relief or specific authorization to enforce the Penal Code, Plaintiffs' equitable claims are necessarily based on the underlying public nuisance and UCL claims, and fail for lack of standing to sue under those statutes, as we have previously determined. The trial court properly sustained the demurrer as to the fifth and sixth causes of action of the SAC.

VI.

*Tortious Interference with Gaming Compact*

The SAC alleges the Chumash Band entered into a gaming compact with the State of California and Defendants knowingly interfered with the Chumash Band's performance of the compact "by making such performance more costly and burdensome." The SAC further alleges the Chumash Band has an economic relationship with the State of California that provides an economic benefit to the Chumash Band, Defendants' illegal banked gaming has "disrupted" that relationship, and the Chumash Band was harmed as a result. On the basis of these allegations and on behalf of the Chumash Band only, the SAC asserted a seventh cause of action for tortious interference with contractual relations and an eighth cause of action for tortious interference with prospective economic advantage.[12] The trial court concluded these

---

[12]    According to the SAC, the Rincon Band offers class III gaming "originally pursuant to a Tribal-State Gaming Compact and currently pursuant to Secretarial Procedures issued by the United States Department of Interior."

60

allegations are not sufficient to state a claim for either cause of action. We agree.

A.  *The SAC Fails to State a Claim for Tortious Interference with Contractual Relations*

To state a claim for tortious interference with contractual relations, a plaintiff must allege: " '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) *actual breach or disruption* of the contractual relationship; and (5) resulting damage.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 (*Quelimane*), italics added.) As to the fourth element, a defendant's conduct may give rise to a claim for tortious interference with contractual relations if it induces an actual breach of plaintiff's contract, or "if plaintiff's performance is made more costly or more burdensome." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1129.)

Here, the SAC does not allege an actual breach or disruption of the gaming compact between the Chumash Band and the State of California. Instead, it alleges that Defendants "ma[de] such performance more costly and burdensome in that, among other things, it has had to pay disproportionate amounts for *public assistance programs and other community economic offsets* necessary, at least in part, to combat public harms resulting from Defendants' illegal banked gaming." (Italics added.) The SAC does not explain how those costs are in any way related to its performance under the gaming compact, which, according to the SAC, allows the Chumash band to offer class III banked games. In other words, the SAC does not allege that Defendants made it more costly and burdensome for the Chumash Tribe to operate class III banked games on tribal lands. Reading the complaint as a whole and its parts in context (*Blank*, *supra*, 39 Cal.3d at p. 318), what the

61

Chumash Band allege is that Defendants' alleged illegal operation of banked card games "diverted" revenue from the tribe's lawful gaming, making it more burdensome for the Chumash Band to provide tribal and governmental programs to its members. That is not an actual breach or disruption of the Chumash Band's performance under the gaming compact to operate class III banked games on tribal land.

Plaintiffs do not make any attempt to clarify the language in the SAC on appeal. Instead, they assert the gaming compact grants the Chumash Band the exclusive right to offer banked games and Defendants interfered with that right by offering illegal banked games off tribal land.[13] The SAC, however, does not allege the compact provides the Tribes with the exclusive right to offer banked games. The SAC alleges it is California law that affords the Tribes the exclusive right to offer banked gaming on tribal land.

Indeed, it is the California Constitution, along with federal law, and not the gaming compacts, that confer that exclusive right to the Tribes. (See Cal. Const., art. IV, §§ 19(e), (f); *Cabazon, supra,* 480 U.S. at p. 211; 18 U.S.C. § 1166 et seq. [IGRA]; *Rincon Band of Luiseño Mission Indians of Rincon Reservation v. Schwarzenegger* (2010) 602 F.3d 1019, 1037 [" 'exclusivity' is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law"]; *Yocha*

---

[13]    Plaintiffs assert that Defendant/Appellee Larry Flynt admitted the gaming compact grants the Chumash Band the exclusive right to offer banked games when he sought, in a separate proceeding, to have "the exclusive rights" of Indian tribes to offer class III gaming declared unconstitutional, and that the trial court should have considered that "admission." As we shall explain, it is the California Constitution, along with federal law, and not the gaming compacts, or any other economic relationship with the state, that confer that exclusive right to the Tribes.

*Dehe Wintun Nation v. Newsom* (E.D.Cal., 2019) 2019 WL 2513788 at *4 ["the California Constitution's guarantee of exclusivity bars the state from using it as a bargaining chip in compact negotiations"].) Notably, as alleged in the SAC, the Rincon Band shares in the exclusive right to offer class III gaming on tribal land despite the fact that it does *not* have a compact with the State of California. Thus, to the extent the claim for tortious interference with contractual relations is based on the Tribes' exclusive right to offer banked games, that right does not derive from the compact, and the claim therefore fails on that basis as well.

B.      *The SAC Fails to State a Claim for Tortious Interference with Prospective Economic Advantage*

Although similar, a claim for interference with prospective economic advantage is distinct and requires that a plaintiff allege: " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [or negligent] acts on the part of the defendant designed to disrupt the relationship; (4) *actual disruption* of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." ' " (*Korea Supply Co. v. Lockheeed Martin Corp.* (2003) 29 Cal.4th 1134, 1153, italics added; see also *Quelimane, supra,* 19 Cal.4th at pp. 55–56 [distinguishing the two causes of action].)

Similarly, the SAC does not adequately allege an actual disruption of the economic relationship between the Chumash Band and the State of California. First, the SAC does not indicate what economic relationship exists beyond the compact itself and to the extent this cause of action relies upon the compact, it fails for the same reason as the claim for tortious interference with contractual relations. Second, to the extent it relies on some other relationship, the conclusory allegations in the SAC, essentially

63

parroting the legal elements of the cause of action, are not sufficient to state a claim.  (See *Moore, supra,* 51 Cal.3d at p. 125; *Blank, supra,* 39 Cal.3d at p. 318.)

In sum, we conclude the SAC does not adequately state a claim for tortious interference with contractual relations or for interference with prospective economic advantage.  The trial court properly sustained the demurrer as to the seventh and eighth causes of action of the SAC.

## DISPOSITION

The judgment is affirmed.  Defendants are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

64